*CJP Supp. 8 Opinion
Commission Counsel, by direction of the Commission.
These are two disciplinary matters, one concerning Bert L. Swift, Judge of the San Bernardino County Municipal Court, and the other concerning James C. McGuire, Judge of the San Bernardino County Superior Court. The matters have been consolidated for all purposes. After formal factfinding and review by the Commission on Judicial Performance (Commission), the Commission has concluded that both matters should be dismissed.
BACKGROUND
Formal proceedings were commenced with the service of the Commission’s notices of formal proceedings dated February 6, 1996.
Judge Swift was represented in the formal proceedings by Thomas C. Brayton and Jones Mahoney, Brayton & Soil of Claremont, California. Judge McGuire was represented by Thomas R. Hudson of Ontario, California. The examiners for the Commission were Dennis F. Coupe and Jack Coyle of the Commission’s Office of Trial Counsel.
Special masters were appointed by the Supreme Court on May 7, 1996.[1] The special masters were directed to prepare a report containing “a brief *CJP Supp. 9 statement of the proceedings had and their findings of fact and conclusions of law with respect to the issues presented by the notice of formal proceedings and the answer thereto [and if they choose] an analysis of the evidence and reasons for the findings or conclusions.” (Then applicable Cal. Rules of Court, rule 912.)
A hearing to take evidence was conducted on August 26 through 28, 1996. On October 17, 1996, the special masters issued their report, recommending dismissal.
Objections were filed by the parties and oral argument was heard by the Commission on January 29, 1997. All commissioners participated. In the course of briefing and argument to the Commission, trial counsel modified or abandoned certain of their contentions before the special masters, and the focus of the proceeding was therefore narrowed. The Commission having considered the arguments of the parties, the report of the special masters, and having independently reviewed the record to assure that the findings reported are supported by clear and convincing evidence, makes the following findings of fact and conclusions of law.
THE FINDINGS OF THE COMMISSION
I
Findings of Fact
In 1993, the National Park Service was investigating the possible theft of Native American artifacts from the Joshua Tree National Monument (Monument). Ranger Todd Swain was the lead investigator. A principal target of the investigation was one Warren Churchwell.
Acting undercover and in the course of his investigation in the fall of 1993, Ranger Swain had twice visited a man named Tony Soares at his residence on Quail Springs Road in Joshua Tree. On both occasions Soares showed him an olla (a ceramic pot) taken from the Monument. Soares told him he had purchased the olla from Warren Churchwell, knowing it had been illegally collected, and that he was probably going to give it to the Monument once it had been restored. Ranger Swain also saw two manos (grinding stones) and a metate (a mortar) on a windowsill near the dining room table. Soares told Ranger Swain he had found them in the desert by Kelso, a town surrounded by the East Mohave National Scenic Area. On the second occasion, when Soares showed Swain the olla, it was sitting on the top of a dresser in his bedroom.
*CJP Supp. 10 Ranger Swain wanted to search for contraband artifacts at Churchwell’s residence in Desert Hot Springs, at a gallery in Palm Springs, and at Soares’s residence. On several occasions Ranger Swain had sought to obtain assistance in preparing search warrants from the United States Attorney’s office. Each time the representative of the Unites States Attorney told him that he was too busy. When this happened again on December 15, 1993, Ranger Swain decided to go through the state system. The next day, on December 16, he obtained the warrants in Riverside County for Churchwell’s residence and the gallery.
Later, on the same day, Rangers Swain and Marion Damiano-Nittoli went to Joshua Tree and met with Deputy District Attorney Ray Pyle. Pyle is the Supervising Deputy District Attorney in the Morongo Office of the San Bernardino County District Attorney. The Morongo Office staff had four deputies, including Linda Root and Gordon Isen.
Pyle read the warrant application for Soares’s residence and approved it. The warrant specified that the objects to be seized were the manos, the metate, the olla and items showing the ownership of the premises. The rangers had checked with the county assessor and determined that the Soares residence was owned by a Dianne Fox.[2]
At approximately 4:30 p.m. on December 16, 1993, the rangers were escorted by Pyle to the courtroom of respondent Judge Bert Swift. Judge Swift is the judge in Joshua Tree for the Morongo Basin Division of the San Bernardino County Municipal Court District. Pyle told Judge Swift that he had two rangers who had a search warrant they wanted signed. He then left.
Judge Swift went into chambers with the rangers and removed his robe. He asked why they were in the state court system rather than in the federal system. Ranger Swain explained that the matter involved multiple jurisdictions and discussed the rangers’ jurisdiction under state law.
Ranger Swain then handed the warrant application to Judge Swift. Judge Swift began to read the affidavit to the warrant. When he read Soares’s name and the address of the premises to be searched in the second paragraph of the *CJP Supp. 11 affidavit he was stunned; he read no further. He announced that Soares was his stepson and that the property to be searched was his house. One of the rangers asked if he knew where Soares was. Judge Swift replied that he did not know, but he offered to find out. In the rangers’ presence, he telephoned his wife, Dianne Fox, Soares’s mother, at her place of employment.[3]
Judge Swift then took the rangers and the warrant application to the chambers of respondent Judge James McGuire.
Judge Swift handed the warrant application to Judge McGuire and told him that he could not review it nor issue the warrant because it involved one of his homes and his stepson Tony Soares.
The rangers sat at a conference table abutting Judge McGuire’s desk; Judge Swift took a seat across from them. The special masters found by clear and convincing evidence that Judge Swift accompanied the rangers and remained in Judge McGuire’s chambers (1) for the purpose of allaying any concerns that Judge Swift would inform Soares about the impending search, and (2) in order to avoid the appearance of impropriety if the search was conducted but the artifacts were not recovered after he left the presence of the rangers, thus affording an opportunity to alert Soares. The special masters also found that Judge McGuire did not question Judge Swift’s continued presence for similar reasons.
Judge McGuire began reading the warrant affidavit and discussing the situation with the rangers. He asked when the rangers intended to serve the warrant. They explained that there were two related warrants (the ones issued in Riverside). The rangers planned to serve the other warrants first because they perceived Soares to be the least culpable target. Judge McGuire pointed out this plan presented a problem because,the proposed search of Soares’s residence had been disclosed to Soares’s stepfather (Judge Swift).
Judge McGuire inquired whether they could serve the Quail Springs Road warrant that evening. They replied that they could not because they did not have the manpower. They told him that there was a policy governing service of warrants which prescribed a certain number of officers. The rangers were adamant that they would not serve a warrant that evening.
Judge McGuire asked if they would be amenable to a consent search. The rangers appeared puzzled. Because they appeared puzzled and because he *CJP Supp. 12 was concerned about being overbearing, he asked the rangers if they would like him to call in the district attorney to advise them. They affirmed that suggestion.
Judge McGuire told his bailiff to summon Pyle. Pyle had left for the day and Deputy District Attorney Linda Root came instead. When she arrived, Judge McGuire, with interjections by Ranger Swain, explained the situation. Judge Swift indicated that he would cooperate in a consent search, and represented that his wife and stepson would also consent at his behest. At that point, Root brought up the fact that she was on the campaign committee of Richard Crouter who would be running in the next election (the following June) for the municipal court seat held by Judge Swift. She assured Judge Swift that despite her allegiance to a prospective challenger she would maintain confidentiality concerning the matter. Judge McGuire observed to the rangers that this impending political campaign was another reason requiring an immediate search. The special masters found, and the Commission concurs, that Root’s raising of this topic and the ensuing commentary were inconsequential, i.e., the conduct of either judge would not have been different had there been no impending election.
Judge McGuire repeatedly asked the rangers if they would like to confer privately with Root. They declined. Ranger Swain responded that he would like to know about the legality of a consent search. Root, not Judge Swift nor Judge McGuire, explained the pertinent concepts, including the scope of parental capacity to consent, noting that an issue of voluntariness could arise concerning a consent by Fox or Soares.
Judge McGuire solicited information about the location of the manos, metate and olla, as identified in the affidavit. The ensuing discussion revealed that the objects were in common use areas or in plain view from common use areas of the dwelling.
From these considerations Root concluded that there was no issue of voluntariness as to Fox and Soares because Judge Swift’s consent would suffice. She advised the rangers that in those circumstances a consent search was a perfectly good search, albeit she did not advocate that they agree to a consent search.
Judge McGuire invited a decision from the rangers on how they wanted to proceed. He informed them that he had read the affidavit, found it to be legally sufficient, and that he would execute the warrant if that was what they decided should be done. The rangers decided to proceed with a consent search that evening. Judge McGuire again inquired if they wanted him to sign the warrant. They responded “No.”
*CJP Supp. 13 Ranger Swain obtained a consent form from his vehicle. Judge Swift executed the consent form. Before the rangers and Judge Swift left his chambers, Judge McGuire gave the rangers a card with his home telephone number and assured them that he would be available to issue the warrant over the telephone if they developed any misgivings about the consent to search. He told them that if there was any problem whatsoever with any of the issues that had been discussed, e.g., the items they sought were not in the common area, or if Fox and Soares were not there or would not consent to a search of any other area of the house, he would issue the warrant.
During the discussions in chambers, Judge Swift made several statements, in addition to agreeing to consent to a search. Concerned for the impact on his family, he asked if the rangers intended to arrest his stepson. Soares is a craftsman experienced in creating reproductions of Native American artifacts. Judge Swift inquired whether the olla might be such a reproduction. He also gave his recollection of the location in the house of the artifacts sought in the warrant.
Although he did participate in the discussion described above, Judge Swift did not participate in the decision as to whether to issue the search warrant.
After Judge Swift executed the consent to search form, he drove to the Quail Springs Road residence, 10 minutes from the courthouse. The rangers followed in their vehicle. Judge Swift led them into the house and introduced them to one of Soares’s younger brothers who was in the living room. No one else was home. Judge Swift asked Ranger Swain where the artifacts were located. Ranger Swain showed him. All the artifacts were where Swain had said they were during the chambers discussion, clearly visible from the living room. The door was open from the living room to Soares’s bedroom, where the olla was located on the top of a dresser.
The next day, December 17, 1996, searches of the Churchwell residence and the gallery were conducted and Churchwell was arrested. Ranger Swain promptly filed reports with the Riverside District Attorney and requested that a criminal complaint be filed against Churchwell. The complaint was issued in January 1994 and in June 1994 Churchwell pleaded guilty to felony counts charged against him.
On the day following the Riverside search, December 18, 1993, Soares appeared voluntarily at the Palm Springs Police Department in response to a telephone request and was interviewed by Ranger Swain. Swain decided that he could not make a case for prosecution with respect to the grinding stones and mortar. His superiors were disinclined to prosecute Soares with respect to possession of the olla.
*CJP Supp. 14 Three months passed. The rangers submitted no report concerning the search of the Quail Springs Road residence to the District Attorney of Riverside County until March 27, 1994. That report was prompted by an inquiry concerning the search and the proceedings in chambers by Sergeant Benge, a narcotics officer with the San Bernardino County Sheriff’s office. Sergeant Benge was an active supporter of the candidacy of Deputy District Attorney Isen for election to the municipal court seat held by Judge Swift. Following the solicitation by Benge, the rangers, in response to a request by Pyle, submitted two reports on the events in chambers and the search to Pyle.
Following receipt of the first report, Pyle specifically requested a “subjective” report on the chambers conference on the representation that this was “necessary for a proper evaluation of the case against Tony Soares.” (Pyle denied requesting such a subjective report.) In response, ranger Damiano-Nittoli filed a second report.
On April 28, 1994, Pyle sent the reports to the District Attorney of San Bernardino County, with a note, in pertinent part, as follows. “Please call when you’ve finished your review. Naturally, Gordon Isen would like to use this somehow in his campaign. Should we release info? If not, can it be leaked?”
Pyle provided copies of the ranger’s reports to Crouter, another candidate in the election.[4] Pyle enthusiastically told Crouter that revelation of their version of the incident would probably defeat Judge Swift.
On May 3, 1994, Pyle issued a rejection letter concerning filing of charges against Soares. In the letter he asserted that the primary reason for rejecting the case was that the search was improper because Judge Swift could not consent to a search of the Quail Springs Road residence. However, Pyle made no investigation to determine the facts concerning Judge Swift’s capacity to consent to a search.
II
Conclusions of Law and Analysis
Before the Commission, the examiners focused their contentions of misconduct by Judge Swift upon the fact that during his conference with the rangers, he placed a call to his wife to determine Soares’s whereabouts. The *CJP Supp. 15 examiners also contend that Judge Swift remained in Judge McGuire’s chambers and participated in the discussion which took place, and that such was misconduct.
As to Judge McGuire, they contend that he committed misconduct in permitting Judge Swift to remain in his chambers and in failing to sign the proffered warrant.
The Telephone Call to Judge Swift’s Spouse
The examiners contend that the telephone call by Judge Swift to his wife violated canon 2A of the California Code of Judicial Ethics which adjures the avoidance of the appearance of impropriety.[5] They argue the telephone call created the appearance that Judge Swift had a conflicting personal interest in the case. They submit that he made the call because of his concern that he could be criticized and submit that the call could have jeopardized a five-month criminal investigation and it had an influence on the ensuing discussion of how to conduct the search.
As a causal matter, the telephone call did not create the appearance that Judge Swift had a conflicting personal interest in the case. He already had disclosed and declared an actual personal interest conflict and announced that he could not act as the magistrate because of the conflict.
The call could only have jeopardized the investigation if it revealed information about the investigation; there is no suggestion that it did. The call may not have been wise, but that does not make it an unethical or unseemly action.
*CJP Supp. 16 Judge Swift’s Presence in Chambers
1.
The examiners contend Judge Swift’s conduct in remaining in Judge McGuire’s chambers is conduct undermining public confidence in the “impartiality” of the judiciary because it indicated that Judge Swift was not impartial in the search warrant proceeding. The examiners point to canon 3B(2), which provides that in the performance of “Adjudicative Responsibilities,” “(2) A judge shall be faithful to the law regardless of partisan interests, public clamor, or fear of criticism . . . .” The examiners suggest that this canon is applicable because Judge Swift expressed a fear that he would be criticized if the search was delayed and evidence was not found.
The canon is inapplicable because the fear in issue was not fear about criticism of Judge Swift’s conduct in the course of his adjudicative responsibilities. He disqualified himself immediately and was not acting as the judge in this matter, so his impartiality was not in issue.
2.
The examiners contend that remaining in Judge McGuire’s chambers created an appearance of impropriety prohibited by canon 2A and that he was using his “influence” as a judge to obtain “confidential” information about his stepson’s case, conduct prohibited by canon 2B.[6]
Judge Swift had a sound reason for remaining in Judge McGuire’s chambers that arguably advanced an important public interest, viz., promoting confidence in the integrity of the judiciary. Through no fault of his own, Judge Swift was placed in a dilemma because a potential charge of appearance of impropriety attended either alternative course of action available. Judge Swift cannot be charged with impropriety because he chose between them, absent a showing that the course of action he selected is clearly less preferable, i.e., more likely to undermine public confidence in the judiciary.
The appearance of impropriety that could attend Judge Swift taking his leave with information that could compromise the criminal investigation may well have been more substantial than that arising from the possible speculation that by remaining he was using his “influence” as a judge to obtain *CJP Supp. 17 “confidential” information about his stepson’s case. Faced with this Hobson’s choice, we cannot say that it was misconduct for Judge Swift to remain in Judge McGuire’s chambers.
3.
The examiners also contend that Judge Swift committed misconduct in Judge McGuire’s chambers by advocating a consent search, notwithstanding his “conflict of interest.” The examiners argue that this created an appearance of impropriety. The special masters found, and the Commission concurs, that Judge Swift did not engage in such advocacy.
The examiners argue that advocating a consent search is improper because it is a use of nonpublic information for a purpose unrelated to his judicial duties in violation of canon 3B(11).[7] However, the use, if any, of nonpublic information here is related to Judge Swift’s judicial duties, i.e., to the prevention of the potential discredit to the judiciary if the planned searches were conducted fruitlessly after he had the opportunity to alert his stepson or other family members about the impending search.
The examiners argue that advocating a consent search was improper because it created “admissibility issues” as to the evidence obtained. The rangers were represented by an experienced prosecutor who advised them concerning such issues.
4.
The examiners contend that by remaining in Judge McGuire’s chambers Judge Swift violated Code of Civil Procedure section 170.3, subdivision (a)(1) which provides: “Whenever a judge determines himself or herself to be disqualified, the judge . . . shall not further participate in the proceeding . ...” In their view, the word “participation” should be construed broadly.
The prohibition on participation, however, pertains to participation as a judge, i.e., as a judicial decision maker. If a judge discerns a personal interest in a controversy and determines he is disqualified, he could nonetheless “participate” in some other capacity in appropriate circumstances, e.g., intervene in the proceeding as a litigant or testify as a witness.
The evidence was clear and convincing that Judge McGuire had assumed the role of decision maker, and that any participation by Judge Swift thereafter was nonjudicial.
*CJP Supp. 18 Judge McGuire
The examiners contend that Judge McGuire was obligated to sign or reject the warrant without broaching any proposals to cope with the potential problem of disclosure. They suggest that Soares was entitled to a neutral and detached magistrate, and that Judge McGuire was not one.
The Commission finds by clear and convincing evidence that the applicant for the search warrant was advised by competent counsel, and counsel concurred that the consent search was appropriate in the circumstances as they existed on December 16, 1993. Judge Swift executed the consent form while in Judge McGuire’s chambers.
While arguably it may have been preferable for Judge McGuire to sign the search warrant, we note that he gave the rangers his home telephone number and invited them to telephone if circumstances changed and they needed a court-ordered, telephonic search warrant. Thus even if Judge McGuire should have signed the search warrant while the rangers were present, we are unable to conclude, in light of the unusual facts confronting Judge McGuire, that his failure to do so constitutes misconduct. His mistake, if any, was at most legal error.
CONCLUSION
The Commission accepts the special masters’ conclusion that these proceedings should be dismissed. Commission members Hon. William A. Masterson, Ms. Ophelia Basgal, Robert C. Bonner, Esq., Mr. Christopher J. Felix, Hon. Lois Haight, Ms. Eleanor Johns, Patrick M. Kelly, Esq., Mr. David Malcolm, Hon. Vincent McGraw, Ms. Harriet C. Salarno and Ms. Pearl West voted to dismiss the matter.
These matters, inquiries 134 and 135, are therefore dismissed. This order shall become final forthwith.

 The special masters were Justice Coleman A. Blease, Judge James H. Chang and Judge Irma J. Brown. They were selected by the Commission from a list submitted by the Supreme Court to hear and take evidence in this matter and to report thereon to the Commission. (See rule 907, Cal. Rules of Court; order by Chief Justice George, dated May 7, 1996.)

 Dianne Fox and Judge Swift were married in February 1993. Three children of Fox by a prior marriage, including Soares, age 23, resided or stayed from time to time at the Quail Springs Road residence. The Quail Springs Road residence had belonged to Fox before the marriage. Thereafter, title was held in her name and that of Judge Swift, as a result of a refinancing of their aggregate debt. After the marriage, Judge Swift and his wife divided their time between the former residence of Judge Swift and the Quail Springs Road house, living part time in each residence. They spent two or three nights a week at the latter residence, where they occupied the master bedroom, and ate most of their meals there with Fox’s children.

 The telephone call did not reveal information about the search warrant or the rangers’ investigation. When Fox answered the telephone, Judge Swift asked her where the children were. She told him where she believed each child was, expressed concern that he was asking such a question, and asked if there had been an accident. He told her there had been no accident and that he would talk to her about it later.

 The Commission notes that this finding directly contradicts Pyle’s testimony that he did not provide the materials to anyone. The Commission does not find Pyle to be credible on this point. Compare the hearing transcript with the testimony of Richard Crouter.

 References herein to a canon are to the California Code of Judicial Ethics, and not to the Code of Judicial Conduct as it existed in 1993. For the purpose of the issues discussed in this decision, there is no material difference between the 1993 and 1996 canons.
Canon 2A and its associated advisory committee comment are as follows.
“A. Promoting Public Confidence
“A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
“Advisory Committee Commentary—
“Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on the judge’s conduct that might be viewed as burdensome by other members of the community and should do so freely and willingly.
“The prohibition against behaving with impropriety or the appearance of impropriety applies to both the professional and personal conduct of a judge.
“The test for the appearance of impropriety is whether a person aware of the facts might reasonably entertain a doubt that the judge would be able to act with integrity, impartiality, and competence.”

 Canon 2B provides in pertinent part: “(1) A judge shall not allow family, social, political, or other relationships to influence the judge’s judicial conduct or judgment.... HQ (2) A judge shall not lend the prestige of judicial office to advance the pecuniary or personal interests of the judge or others . . . .”

 Canon 3B(11) is as follows: “(11) A judge shall not disclose or use, for any purpose unrelated to judicial duties, nonpublic information acquired in a judicial capacity.”